Filed 1/23/17

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re CARL H., a Person Coming Under the Juvenile Court Law. | |
| SAN FRANCISCO HUMAN SERVICES AGENCY,<br>    Plaintiff and Respondent,<br>v.<br>N.B.,<br>    Defendant and Appellant;<br><br>CARL H., a Minor, etc.,<br>    Objector and Appellant. | A147220<br><br>(City & County of San Francisco Super. Ct. Nos. JD153221, JD153222) |
| In re HARMONY F., a Person Coming Under the Juvenile Court Law. | |
| SAN FRANCISCO HUMAN SERVICES AGENCY,<br>    Plaintiff and Respondent,<br>v.<br>N.B. et al.,<br>    Defendants and Appellants;<br><br>HARMONY F., a Minor, etc.,<br>    Objector and Appellant. | A147335<br><br>(City & County of San Francisco Super. Ct. Nos. JD153221, JD153222) |

N.B. (Mother) and her daughter Harmony F. appeal from juvenile court orders establishing jurisdiction over Harmony and bypassing family reunification

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I and II B of the discussion.

1

services for Mother. The court found that Mother's neglect contributed to the death of Harmony's baby sister Melody and that there was no clear and convincing evidence that offering Mother reunification services was in Harmony's best interest. Mother asserts neither finding is supported by the record and that the denial of reunification services was an abuse of discretion. Harmony also challenges the denial of reunification services. Harmony's father, Kevin F., joins in their arguments.

In a separate appeal[1] Mother challenges the juvenile court's assertion of jurisdiction over her son Carl Jr. Carl Jr. contends the court erred when it dismissed his petition after establishing dependency jurisdiction over him. He also asserts the bypass of services for Mother was an abuse of discretion.

Assessed under the relevant legal standard, the record supports the court's jurisdictional findings and the bypass of services to Mother. However, the dismissal of Carl Jr.'s dependency case because findings were unsustained as to his custodial parent was error. We therefore reverse in part, affirm in part and remand to the juvenile court for further proceedings.

BACKGROUND

*Events Preceding Melody's Death*

Raised by a mother who struggled with addiction, Mother's childhood was marked by abuse and neglect. When she was 13 years old she began an abusive and violent relationship with Carl Sr., then a 20-year-old high school dropout. Their child, Carl Jr., was born when Mother was 14.

While she was still a minor, Mother left Carl Sr. and was in a relationship with Kevin F. That relationship, too, was characterized by domestic violence.

---

[1] On our own motion, we deemed it appropriate to consolidate the two appeals for consideration and disposition because they involve common and interrelated issues of fact and law. (See *People v. Dixon* (1993) 20 Cal.App.4th 1029, 1033 fn. 2.)

Mother and Kevin F. had two children: Harmony F., born March 2012, and Melody F., born November 2013.

The family, including both fathers, had at least 13 referrals to CPS for physical and emotional abuse and neglect before Melody died in 2015. In 2012 Carl Sr. learned that Kevin F. was hitting Carl Jr. and calling him names. This led to fighting between the two men and CPS intervention. To protect her son, Mother gave Carl Sr. full custody of Carl Jr. with visitation for her every other weekend. From then until December 2014, father and son lived with Carl Jr.'s paternal grandfather. However, both parents used the maternal grandmother (Grandmother) as a respite caregiver. Carl Jr. thus stayed with Grandmother when Carl Sr. was arrested in January 2013 and again in May 2014, and she watched Carl Jr. when Carl Sr. ran errands. Grandmother also looked after all three children at least two weekends a month when Mother had to work and Kevin F. was unwilling to take care of their daughters.

In February 2014 Carl Jr., then six years old, was staying with Grandmother while his father was incarcerated. Grandmother asked the boy to pick up a methadone pill she had dropped. Carl Jr. picked up the pill and swallowed it. He was immediately taken to the hospital, and survived.

Following this incident, protective services worker Jonathan Newsome interviewed family members at the hospital and later in Grandmother's home. The home was extremely cluttered but did not appear dirty. Newsome did not see any inappropriately stored medications or other overt safety hazards. Mother said she lived in an HUD-approved apartment but was temporarily living in a hotel while repairs were being made. She had a court date in family court the next month to change Carl Jr.'s custody arrangement. Mother told Newsome she could care for her son full time with help from a cousin and other family members. With Carl Sr.

incarcerated, Newsome determined the hospital could release Carl Jr. to Mother's care.

The San Francisco Human Services Agency (the Agency) convened a team decision making meeting with Mother, Grandmother and Carl Sr. to address the children's safety. They agreed the children would not return to Grandmother's home until it was properly cleaned and organized. Grandmother agreed not to take medications in front of the children or leave them within the children's reach. Carl Sr. agreed not to yell at his son or abuse him emotionally, verbally or physically, to use age-appropriate tools for discipline and redirection, and to follow up with services that had been ordered in his criminal case. Carl Jr. was to remain in Carl Sr.'s care and his sisters would remain with Mother, "with a significant amount of services for both mother and father."

Newsome wrote that "mother appears to be very resilient yet at the same time overwhelmed. She is working, attending school, and caring for her children when at all possible. She appears to be utilizing the support she has at her disposal but the Department can only hope that her children don't suffer with [her] busy and ambitious schedule. It has been very clearly presented that so long as the [Grandmother's] home is in [its] current state (extreme clutter), the children are not allowed to be cared for there." Newsome concluded the children were not at an imminent risk in Mother's care, "and therefore the Department feels that closing the referral after having connected the family to DR and Safe Care services is appropriate."

On June 6, 2014, Protective Services Worker Jane Phan visited Grandmother's home after hearing that Carl Jr. was staying there with Mother while Carl Sr. was in jail for non-compliance with court-ordered domestic violence classes, and that the house was so severely cluttered it was unsafe. Mother had left Kevin F. after he physically assaulted her while she was holding 7-month-old

4

Melody. Mother reported she was working with Homeless Prenatal and SafeCare workers and asked for help obtaining other services.

On June 10 Phan spoke with Carl Jr. and his father in their home at the paternal grandfather's house. Carl Jr. said that during his weekends with Mother he stayed at Grandmother's home. He did not stay at Mother's house because Kevin H. lived there. Carl Sr. told Phan he would drop Carl Jr. off at Grandmother's house for visits with Mother. He said there was some clutter there and mentioned Carl Jr.'s February 2014 methadone incident, but overall he had "no concerns" about Grandmother. The Agency concluded no action was required.

In December 2014 Carl Sr. got into a fight with the paternal grandfather. As a result, he and Carl Jr. moved out of the grandfather's home and moved in with Grandmother. He later told a social worker he did not think living at Grandmother's was a problem because Carl Jr. was now older and understood not to take her medications.

*Melody's Death*

On April 17, 2015, Mother dropped Harmony and Melody off with Grandmother. Carl Sr. got home around midnight and went to sleep in an upstairs bedroom. Mother came back around 2:30 a.m. She checked on the children, who appeared to be fine. In the morning Grandmother discovered that Melody was not breathing and called an ambulance. Melody, then 17 months old, died that morning from acute methadone toxicity.

The incident was investigated by protective services worker (PSW) Nicole Lock. On July 16 she and PSW Alicia Rodriguez conducted an unannounced visit to Grandmother's home. The home "was extremely cluttered and there was a current hoarding issue in the home. Although there is space to walk around the home, the undersigned immediately determined that the home was not safe for children to reside. . . . [T]he home was filled with racks of clothes in the living

5

room, boxes of clothes, paperwork, piles of other various items. The undersigned also observed medication containers on the piano, on the coffee table, and in brown grocery bags on the floor of the living room. . . . [T]he bedroom downstairs cannot be used for sleeping due to tremendous clutter." In the room where Melody spent her last night there were "a lot of medication bottles kept on the side of the bed table, on top of the dressers, and there were miscellaneous pills on top of the furniture." Some of the medications were within the children's reach.

Lock pointed out various safety concerns and told Carl Sr. that Grandmother's home was inappropriate for children. Carl Jr. said he never left his son alone or unsupervised in the house, and that he had nothing to do with Melody's death.

In a forensic interview on July 20, Carl Jr. said his father and Grandmother smoked cigarettes and "blunts," which were long and brown "and they put some type of stuff, green stuff in it." In addition, both Grandmother and her mother ("Nanny"), who also lived in the house, had pills, like methadone, stomach pills, "pooping pills," headache pills and pain pills. Carl Jr. knew where the pills were kept. He said "all three of us—all the children can get into them, 'cause they need to put them in a safe place with a lock, that's where they need to put them, so no one can get to the pills and take one." Asked if that had ever happened, Carl Jr. answered: "I picked one up off the floor and took one" and "that's what happened with my sister. [¶] . . . [¶] The one that died."

Carl Jr. said Nanny kept a pill bottle, as well as cookies and "a lot of stuff" on her bed, so he thought Melody probably woke up and got a methadone pill from there. He knew the bottle contained methadone because "every time—she has me read the bottle. [¶] . . . [¶] And she has me make her pills too." He explained that he usually prepared Nanny's pills when her caregiver did not come to work. The

6

last time he remembered giving Nanny her pills was when he was seven, but he stopped doing it after the February 2014 incident.

Carl Jr. said he thought Grandmother kept methadone in three bags on the floor. She also had "hecka pills" in a pill box. It was "so easy" to get into Grandmother's pills, "all you have to do is lift the thing up and take a pill."

When the interviewer asked Carl Jr. about the rules at Grandmother's house, he replied "No running in the house. [¶] . . . [¶] That's it." Asked specifically if there were rules about the pills, lighters, cigarettes or blunts, he said "Nope."

*The Dependency Petitions*

The Agency filed petitions on behalf of Carl Jr. and Harmony alleging failure to protect under section 300, subdivision (b) because: parents allowed them to live in a home where dangerous medications were left within easy access despite Carl Jr.'s methadone poisoning in February 2014; the home was highly cluttered, with medication containers on various surfaces and the living room floor; Mother failed to adequately supervise the children by frequently leaving them at Grandmother's home with Grandmother or Carl Sr. despite the earlier incident and warnings from the Agency; and Kevin F. was living in a residential facility and failed to protect his daughters.[2] Both children's petitions alleged sibling abuse pursuant to section 300, subdivision (j) and that Mother caused another child's death through abuse or neglect pursuant to section 300, subdivision (f). The children were detained in the care of a relative.

*Jurisdiction/Disposition Report*

The Agency's combined Jurisdiction/Disposition report recommended that Harmony remain with caretaker Iona V., that no reunification services be provided

---

[2] Additional subdivision (b) allegations that Mother had a history of depression and psychiatric hospitalization (b-6) and related to the 13 prior referrals (b-5) were later stricken .

to Mother pursuant to section 361.5, subdivision (b)(4), and that the court set a permanent planning hearing because the caretaker was willing to adopt her. The Agency recommended that Carl Sr. participate in therapy to address his unstable lifestyle, anger management issues and involvement in domestic violence; complete a parenting education program; and obtain and maintain suitable housing for himself and Carl Jr. for a reasonable period of time to be considered for reunification.

*Jurisdiction/Disposition Hearing*

The combined jurisdiction/disposition hearing extended over multiple days, between November 9, 2015 through January 13, 2016. The Agency called the medical examiner, several child welfare workers and in-home service providers, and the forensic interviewer to testify to the facts recounted above, which are essentially undisputed.

PSW Newsome testified about his investigation of the February 2014 incident involving Carl Jr. and the safety plan generated at the team decision making meeting. He had "made it very clear," and Mother understood, that the children were not to be at Grandmother's home until it was cleaned. Newsome also went over medication safety with Mother and Grandmother and spoke to Grandmother about properly storing her medicines. PSW Lock testified that Mother acknowledged after Melody's death that she was aware of the safety plan and requirements for storing medications at Grandmother's.

Child protection worker Myeshia Griece prepared the reports for the hearing. The Agency recommended out-of-home placement with reunification services for Carl Sr. and Kevin F., but not Mother. Carl Sr. was unemployed and had no other income. Griece believed he could benefit from services "so that he could identify particular risks that he places his child in." She had concerns about "the decisions that he makes as a parent in the risk that he places his child in. . . . because he left

8

his child in a home where the child was dispensing medication as if he was an adult" although he had other options for places to live. Carl Sr. also exposed Carl Jr. to marijuana: "He knew what it looked like; he knew the process of putting the stuff in. [¶] So yes, that is definitely a concern." Moreover, Carl Sr. had not followed up on referrals to parenting, substance abuse, housing and other services.

Addressing the out-of-home placement recommendation for Carl Jr., Griece testified that despite having other housing options Carl Sr. placed his son at risk by choosing to live in an unsafe home. She believed even if they lived elsewhere Carl Jr. would remain at risk with his father, but Carl Sr. would benefit from services to "strengthen his parenting as well as helping him with making better judgment calls with regard to his child's safety."

Griece also recommended out-of-home placement for Harmony. Kevin F. had anger management issues and lacked a stable home and lifestyle. He drank "a lot" and abused other substances. Although he had been in substance abuse treatment, he refused to sign releases authorizing the Agency to access information about it, and his behavior indicated ongoing drug use. Griece's supervisor later elaborated that at every contact with him, Kevin F. appeared to be either under the influence or coming down off of a substance. He had not participated in any of the services he had been offered.

Griece testified that the Agency considered Mother responsible for Melody's death. After the February 2014 incident with Carl Jr., Mother "had a lot of things going on and she placed yet another minor, that was much younger, at risk as well because she didn't-because she didn't take the proper steps to ensure that the house was safe prior to her kid going over there and visiting with the grandmother. . . . [E]ven with her participating in SafeCare, and different things like that, it just seems that there's something more that needs to happen with regards to ensuring Harmony's safety." But Mother also demonstrated strengths: "Mom appears to be

9

a hard worker. You can definitely tell that she loves her kids. She's been able to maintain stable employment." Mother always provided for the children's food, clothing and shelter when they were in her care. Mother voluntarily participated in Agency-recommended services before Melody's death, including services specifically related to home safety, and there was no evidence Mother abused substances.

In June 2014 Mother told Phan she would not leave Melody at Grandmother's home without supervision, but the night before Melody died she did just that, without checking Grandmother's home for safety. That was of concern "[b]ecause of the previous incidents and the constant clutter and the minor's accessibility to the medication."

Griece felt it was appropriate for Mother to have a relationship with the children but that it would be detrimental for them to be in her care. "I honestly believe—it's the Agency's understanding and opinion that [Mother] has placed the minors at risk several times; and at this time, it would be in the child's better interest to be in a safer environment than what [Mother] can provide at this time. This is the second child that's ingested Methadone within a year span—a little over a year span." Griece was concerned Mother would place the children at risk if she had unsupervised visits with them, "making decisions that [weren't] necessarily in the kids' best interest with regards to letting the kids go to her mother's home, the domestic violence that she's experienced." Griece expected the children would be placed with relatives.

The parties stipulated to several facts about Carl Jr.'s level of understanding and his actions. He: (1) understood safe medication storage, and "[s]pecifically, that medicines are to be kept away from children, preferably in a locked box"; (2) understood he should not touch medications and that children should stay away from them; (3) "has stated that he will never take adult medications again"; (4)

10

"has not touched his grandmother or great-grandmother's medications since February 2nd, 2014; and (5) if he did "help organize an adult's medications, it was before the February 2014 incident." Carl Jr.'s counsel urged the court to take jurisdiction of both children and offer Mother reunification services: "I think bypassing the mother would further traumatize the minors. I think separating these children from their mother would make the tragedy worse." Counsel's report noted it was unclear how long the current relative caretakers would be able to care for the children.

Carl Sr. testified that he gained full custody of Carl Jr. in 2012 due to domestic violence at Mother's home with Kevin F., and Mother had visitation at Grandmother's house every other weekend. It was during one of those weekends, while Carl Sr. was incarcerated, that Carl Jr. ingested methadone. After that incident, he told Carl Jr. not to touch medication "don't even look at it, don't go near it, how dangerous it was." Carl Jr. said he understood and would not do it again. When Carl Sr. moved into Grandmother's house in January 2015 he "indicated to grandmother to keep the medicine up, keep'em out of reach of kids and children and so forth." He had other housing options with relatives in Tracy and Millbrae, but Tracy was too far away and his cousin in Millbrae was "going through a bit of a situation" with his wife, so he "didn't feel like that was the best situation for my son to be in."

Asked if he saw any issues with Carl Jr. living in Grandmother's home, Carl Sr. said "Other than the past incident, no. I mean, I understand his grandmother loves him to death. She wouldn't purposely harm him or anything like that." He was asked about the condition of the home, and said he had cleaned up the bedroom he shared with Carl Jr. so "our living situation was a little bit different than the rest of the house." He had "moved out numerous . . . black big trash bags, there was a few of those in the room that I moved out. There was at least close to

11

10 boxes I moved out of the room, numerous clothes, clothes items, trash a little bit and just numerous items." Carl Sr. denied that his son ever prepared Nanny's medication. He did not believe Carl Jr. would take adult medicines again "basing off my son's character. I'm not basing it on every eight-year-old. . . . I feel like my son is a little bit above his age. I see my son like a 10- or 11-year-old, but he's only eight. He is a smart cookie."

Carl Jr.'s relationship with Mother was "[v]ery important. . . . Nice, caring, loving, very cuddly. I mean, like a mother should be to a son or a daughter. She's very loving and caring." Carl Jr. "loves her to death sometimes more than me. He wants to be with his mom. He doesn't want to be without her, that's for sure. It would hurt him more for her to be taken away from him than reunited." Although the custody schedule called for Mother to visit every other weekend, visits were actually more frequent: "To be honest with you, me and her have an agreement, she can see him whenever she wanted to. It wasn't really scheduled. I mean, it was court ordered for her to see him every other weekend, but she could always call up and say, I want to see Little Carl and she would be able to do that."

After Carl Sr. and Carl Jr. moved into Grandmother's house, Carl Sr. estimated he was there 95 percent of the time. "I was supposed to be there every day. At the time, I wasn't working. I didn't have a job. I wasn't doing too much but taking care of my son. So I was pretty much there all the time. Not all the time, but with my son, I was." There were times "[w]hen I would go to the store or maybe sometimes I might go out with friends for an hour or two; but other than that, I was there. I rarely needed to go out." He left Carl Jr. in Grandmother's care fewer than five times between January and July 2015.

Mother's sister Jewel described Mother as "a very loving and caring mother. She always puts the best interest of her kids first. She will do whatever she can for her children. She works hard to provide for her kids. Her goal is to just not be a

product of the system. She does whatever it takes to try to ensure that her kids are well taken care of." After the February 2014 incident she, Mother and Iona cleaned Grandmother's house and cleared out some of the clutter. Mother had always been overprotective, and was especially so since Melody's death. She had no social life "because she has kids to take care of"; it would be very unusual for her to go out to bars or clubbing. She did not know if Mother went out to dinner and a club the night Melody died.

Jewel said the children were doing "horrible" since they were removed: "they cry a lot. I've never seen Carl cry, like really break down and cry, saying he misses his parents as much as I've seen now. Even talking to the kids on the phone. I talk to them probably every other day at least, and every time I talk to Harmony, she's like, where's my mom, Ti-Ti? She with you? Is my mom with you? Can I talk to her? Can you call her? I want to see her. . . . [¶] She just cries."

The sisters are very close. Mother and the children could live with Jewel if they could not stay with Iona. Jewel would help her with parenting.

Rebecca is Mother's sister-in-law. She testified that Mother was "an excellent mom. She's an A-1 mom" and "super patrol mom. She is safety number one when she's with her kids." Jewel said Mother worked overtime and sacrificed to make sure the children had what they wanted. Asked whether Mother had an active social life, she said "no, I don't see that. I see a mom who works, comes home to her kids, [gets] up the next morning, and goes back to work."

*Jurisdictional Rulings*

On December 29, the court announced its jurisdictional findings. It first stated its findings on Carl Jr.'s petition. It found untrue the (b)(1) allegation that the parents put Carl Jr. at risk of harm because dangerous medications were left within the easy reach of children at Grandmother's home: "I do not find that [Carl

13

Jr.] was put at threat by the charge in (b)(1). Just from the evidence that I heard during the course of the proceedings the child seemed to be aware."

The court also found untrue the (b)(2) allegation that Grandmother's home was highly cluttered, with little room to move around and medications left out. The court cited the testimony that Carl Sr. cleaned out the room he shared with his son and that some sporadic efforts had been made to clean the house. Although the court found the home was indeed cluttered, it found the "cluttered nature of the place" was not a threat because Carl Jr. "seemed to be able to negotiate that aspect of the home."

The court also found untrue the (b)(3) allegation that Mother frequently left Carl Jr. with Grandmother or Carl Sr. at Grandmother's house despite the known danger that he would have access to methadone. The court explained "again, because this is an older child, I am not going to find that that is true. I don't think the supervision was inadequate. I believe, as I understood from the testimony, that father was on-site most of the time. There was occasion that he was not. The Court was disappointed that father did not expand his role in supervision regarding the other children, but that is not what is charged here." The court also found untrue the parallel (b)(4) allegation that Carl Sr. failed to protect Carl Jr. from exposure to unguarded medications, again because Carl Jr. "was very well aware of the issues in regards to medication."

But the (f)(1) allegation that Mother caused another child's death through abuse or neglect was found true by clear and convincing evidence that Melody died from ingesting drugs left within her reach despite Mother being on notice of the possible danger after the incident with Carl Jr. "Now, the reason I'm finding it in regards to mom is because mom was the supervising adult in regards to what happened. She's the one that knows and she's the one that has this allegation. Father does not."

14

Finally, over the Agency's objection, the court found untrue the subdivision (j)(1) sibling abuse allegation premised on Melody's death and the children's exposure to hazards in the home. After a recess, the court attempted to clarify its reason for striking this allegation.[3] "I did re-review the 300 (j) section, and that's the reason I knocked it out with regards to . . . [Carl Jr.]. It says that 'the child's sibling has been abused or neglected as defined,' and it lists particular subsections, which was not the basis of the (j) section, but it also continues, 'The court shall consider the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, and the nature of the abuse or neglect of the sibling.' And so those were the reasons that I did not find it to be applicable." The court reiterated its view that Carl Jr. "would not have ingested based on [his] hard-earned experience, which was his own."

The Agency disagreed. Counsel argued that Carl Sr. put his son "in a situation that an eight-year-old[4] shouldn't be required to make a determination that one drug is potentially fatal and one isn't. And there was actually testimony by

---

[3] The allegation was substantially the same in each child's petition. Harmony's petition read: "The minor's sister Melody [F.] was found dead in the home by firefighters in April of 2015, and an autopsy documented that Melody, who was one year old, had methadone in her system at the time of her death. The relative's home in which the baby died (and where this minor has frequently been left with relatives) has been found to have substantial amounts of medication, including methadone, in bags on the floor, and in other locations throughout the home to which the children have easy access." The subdivision (j) allegation in Carl Jr.'s petition read: "The minor's half-sibling Melody [F.] was found dead by firefighters in April of 2015, and an autopsy documented that Melody, who was one year old, had methadone in her system at the time of her death. The relative's home in which the baby died (and where this minor has been residing with his father) has been found to have substantial amounts of medication, including methadone, in bags on the floor, and in other locations throughout the home to which the children have easy access."

[4] Carl Jr. was six years old when he ingested Grandmother's methadone in 2014 and eight years old at trial.

Carl Jr. in his CASARC DVD four days after his sister passed away that he continued to place medication in a medication container for his grandmother months after Cal Jr.'s initial ingestion." The court responded: "I fully considered what you're saying, but it did not seem to me that given the circumstances that [Carl Jr.] stood in the same shoes as the—well, the poor—well, the other younger kids. And so after reading *Rocco M.*,[5] I felt that I was compelled to make the finding that I did."

On December 29 the court found that Carl Sr. was a non-offending custodial parent and announced its intent to return Carl Jr. to his care. The Agency believed the child was still at risk, but that he had to be returned to his father's care because no allegations were sustained as to Carl Sr. The court declared Carl Jr. a dependent child and dismissed his petition in favor of family law custody orders specifying that the parents share joint legal custody with sole physical custody awarded to Carl Sr. The "Custody Order—Juvenile—Final Judgment" filed January 4, 2016, reflects the termination of juvenile court jurisdiction over Carl Jr. with supervised visitation for Mother.

The court sustained each of the allegations of Harmony's petition, including the allegation under subdivision (j) (sibling abuse) and subdivision (f) (causing another child's death through abuse or neglect), and found by clear and convincing evidence that Mother should have known, and probably did know, that there was methadone in Grandmother's home.

*Disposition/Harmony*

On December 28 the Agency filed an addendum disposition report authored by Protective Services supervisor Pamela Connie. She outlined the long history of abuse in Mother's relationships with both fathers, noting that all three children

---

[5] *In re Rocco M.* (1991) 1 Cal.App.4th 814.

were exposed to ongoing domestic violence. She reported that Kevin F. and his family had objected to Mother using Grandmother for childcare "due to [Grandmother] not changing their diapers when needed, clothing them appropriately for the weather and feeding them. . . . [M]other thought that the conditions in which her mother lived were normal because that's what she grew up in. . . . A home which is frequently cluttered, has questionable individuals coming in and out, and has all the characteristics of an active addict. I would like to point out that [Grandmother] is an active addict although she may have stopped abusing illegal narcotics years ago, she is still using high doses of methadone and has numerous prescribed narcotics."

She discussed Carl Sr.'s presence in the home at the time of Melody's death: "Mr. [H.] stated that Melody and Harmony were not his responsibility although he [has] known them their entire life and they are the half siblings to his son. Such callous disregard for children's lives and wellbeing is not something that a known service can address."

After consulting with numerous Agency personnel, trauma specialists, and mental health professionals, Connie determined that Mother needed intensive trauma-focused treatment. "It is the opinion of everyone consulted that [Mother] will need years of trauma therapy and will have to work very diligently to address her lifelong traumas. It is my opinion that [Mother] will not be able to parent or participate in her children's care until she addresses her trauma. The Agency is requesting that no services be offered to [Mother] because it will take years of treatment before [she] is at a minimal sufficient level of parenting; especially a child, Harmony, with multiple special needs."

Connie strongly disagreed with a suggestion that Carl Sr. needed only to obtain appropriate housing to reunify with his son. "I wholeheartedly disagree with any such assessment as [Carl Sr.] has had a sexual relationship with a minor,

17

physically abused [Mother] in front of their son, chose to live with his son in an unsafe house when he had access to appropriate housing, and felt that it wasn't his responsibility to care for his son's two young siblings in the home where he lived. [Carl Sr.] needs to demonstrate his ability to make decisions in the best interest of his son and that demonstration should [be] monitored over a significant period of time. Carl Jr. has parented himself long enough."

At the hearing Connie recommended that Harmony live with a relative under Agency supervision and that reunification services be offered to Kevin F., but not to Mother. She reiterated the Agency's belief that Mother would need extensive therapy in order to put her children's needs ahead of her own and that it would take well beyond 24 months of services to enable Mother to safely and adequately care for her children. Nonetheless, it was in both children's best interest to maintain an ongoing relationship with her. Iona was an excellent caregiver and the children were doing remarkably well in her home.

Mother called social workers Nicole Lock and Bonnie Gordon and her sister Iona. Lock and Iona testified positively about Harmony's attachment to Mother. Iona testified that after the incident with Carl Jr. Mother made sure that medications were kept out of his reach. Iona was available and willing to provide Mother with whatever support she needed, including a place to live.

Bonnie Gordon, a private social worker, testified that Harmony would benefit if mother received services even if they did not reunify. Therapy would improve Mother's coping skills and ability to deal with past trauma, which in turn would allow her to be more present for Harmony. Domestic violence services could prepare her to be a good role model for Harmony, while joint work with a therapist would help improve their relationship. Gordon recommended intensive trauma-focused treatment, which she said can produce significant gains in as little as three

to twelve weeks. Gordon believed that, with intensive therapy, Mother could provide a minimum sufficient level of care within twelve months.

The children's counsel called private social worker Abbie McGowan. McGowan reviewed the reports and met with Harmony twice, including during a visit with Mother. She testified that Harmony was attached to her mother and Mother was attentive and appropriate during visits. McGowan recommended that Mother receive intensive reunification services for Harmony's benefit, and repeated Gordon's recommendation that Harmony attend therapy with Mother. Asked why she thought it was in Harmony's best interest that Mother receive services, she testified that Mother had a lot of issues to work on and she needed support to be able to be there for Harmony and help her in a more positive way. Moreover, Harmony would be traumatized if she were not allowed to reunify. Further separation from Mother would be difficult for her, and it would be detrimental not to let her continue developing their relationship.

*Dispositional Rulings*

The court found by clear and convincing evidence that Melody's death was due to Mother's neglect and found there was no clear and convincing evidence that reunification would be in Harmony's best interest. It approved Harmony's placement with Iona V. and set dates for six and twelve-month review hearings. Kevin F. was ordered to obtain and maintain suitable housing and complete reunification services including a residential drug treatment program, therapy to address anger management and domestic violence, and parenting education. Mother was granted therapeutic or supervised weekly visitation.

Harmony, Carl Jr., Mother, and Kevin F. filed timely appeals, which we consolidate for argument and disposition.

19

## DISCUSSION

### I. *Jurisdiction*

As noted above, on Carl Jr.'s petition the court dismissed the subdivision (b) (failure to protect) and (j) (sibling abuse) allegations and sustained the subdivision (f) allegation that Mother's negligence caused Melody's death. The court sustained Harmony's petition in toto. Mother and Carl Jr. challenge certain of the court's findings. We conclude the juvenile court properly found the children to be within its jurisdiction.

### A. *The Allegations under Section 300, subdivision (f)*

As to both children, Mother contends the subdivision (f) allegations lack sufficient evidentiary support. As to Carl Jr.'s petition, she also asserts the subdivision (f) finding that she caused Melody's death is fatally inconsistent with the court's rejection of the failure to protect allegations under subdivision (b), and, alternatively, that neither provision applies to her because she was not Carl Jr.'s custodial parent. Carl Jr. contends the court erred in finding the subdivision (b) allegation in his petition untrue on the basis of his age and experience.

Our starting point is the evidentiary basis for the finding that Mother "caused the death of another child through . . . neglect." ( § 300, subd. (f).) "When sufficiency of the evidence to support a finding is challenged on appeal, the appellate court determines if there is any substantial evidence to support the finding." (*In re Ethan N.* (2004) 122 Cal.App.4th 55, 64 (*Ethan N.*).) " ' "[O]ur review requires that all reasonable inferences be given to support the findings and orders of the juvenile court and the record must be viewed in the light most favorable to those orders. [Citation.]" ' [Citations.] 'Evidence sufficient to support the court's finding must be reasonable in nature, credible, and of solid value; it must actually be substantial proof of the essentials that the law requires in a particular case. [Citation.]' [Citation.] '[W]e . . . must uphold the trial court's

20

findings unless it can be said that no rational factfinder could reach the same conclusion.' " (*In re Athena P.* (2002) 103 Cal.App.4th 617, 628–629.)

Unlike other subdivisions of section 300, subdivision (f) does not require evidence of a nexus between the circumstances leading to a child's death and a current risk to the responsible parent's living children. (*In re Ethan C.* (2012) 54 Cal.4th 610, 637–639 (*Ethan C*).) This difference reflects the Legislature's apparent determination that a parent's "neglectful or abusive responsibility for a *child fatality* may *inherently* give rise to a serious concern for the current safety and welfare of living children under the parent's . . . care, and may thereby justify the juvenile court's intervention on their behalf without the need for separate evidence of findings about the current risk of such harm." (*Id.* at p. 638.)

"[T]the neglect by which a parent or guardian 'caused the death of another child' may include the parent's or guardian's breach of ordinary care, and need not amount to criminal negligence." (*Ethan C., supra*, 54 Cal.4th at p. 637.) In this context, "cause" means the parent or guardian's wrongful acts or omissions " 'were a substantial factor in bringing [the child's death] about. [Citations.] If the actor's wrongful conduct operated concurrently with other contemporaneous forces to produce the harm, it is a substantial factor, and thus a legal cause, if the injury, or its full extent, would not have occurred but for that conduct. Conversely, if the injury would have occurred even if the actor had not acted wrongfully, his or her conduct generally cannot be deemed a substantial factor in the harm.' " (*In re Mia Z.* (2016) 246 Cal.App.4th 883, 892, quoting *Ethan C., supra,* 54 Cal.4th at p. 640.)

Here, the evidence supports the court's findings that Mother's negligent conduct was a substantial factor in Melody's death. Mother knew the circumstances of Carl Jr.'s methadone poisoning at Grandmother's home. She knew Grandmother was on methadone. It was made very clear to her after Carl

21

Jr.'s methadone poisoning that the children could not be safely left at Grandmother's until the house was cleaned out and all medications were safely stored out of their reach. Mother had participated in services specifically related to home safety. She told social worker Phan she would not leave Melody at Grandmother's home and on at least some occasions after the incident with Carl Jr. she refused to let Grandmother watch the children there. But the night before Melody's death, Mother left the children to be cared for in Grandmother's house without ensuring that the home was safe for the children. The court reasonably found this constituted neglect, and that it was a legal cause of Melody's death. "The issue is not whether Mother knew the exact instrumentality that posed a risk to [the child], but whether Mother should have appreciated the risk of death to which she exposed [her]. . . ." (*In re Mia Z., supra,* 246 Cal.App.4th at p. 893 [subdivision (f) finding sustained where an unsupervised toddler was crushed by a gate after wandering from home].)

Mother relies on other evidence to argue that she reasonably believed she could safely leave the children with Grandmother. For example, she points to evidence that at certain times social workers found no safety threats in the house and closed referrals; that the Agency never outright forbade her from leaving the children in Grandmother's home; that she and her sisters cleaned the home up after Carl Jr.'s hospitalization; and she participated in the SafeCare program. She also maintains there simply was not enough evidence showing how Melody obtained and ingested Grandmother's methadone—e.g., where it was, how much she took, the location of other family members at the time, the exact condition of Grandmother's home that day, whether the responding paramedics saw medications near Melody's body—to prove Mother's neglect. In essence, Mother is asking us to reweigh the evidence. We cannot. The record set forth above contains sufficient evidence to affirm the trial court's findings. If supported by

22

substantial evidence, the judgment or finding must be upheld, even though substantial evidence may also exist that would support a contrary judgment and the dependency court might have reached a different conclusion had it determined the facts and weighed credibility differently. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228; *In re Misako R.* (1991) 2 Cal.App.4th 538, 545.)

Mother makes the same argument as to Carl Jr.'s petition. She says the court's factual findings under subdivision (f) are inconsistent with its findings under subdivision (b), and therefore that the judgment must be reversed. Not so. Verdicts are deemed inconsistent when they are " 'beyond possibility of reconciliation under any possible application of the evidence and instructions.' " (*Oxford v. Foster Wheeler LLC* (2009) 177 Cal.App.4th 700, 716.) The court found the subdivision (b) "failure to protect" allegations of Carl Jr.'s petition not true because it believed Carl Jr. was mature enough to navigate the hazards in Grandmother's household, and Carl Sr. supervised him "on-site" most of the time. It sustained the subdivision (f) allegation because it found Mother's behavior was a substantial factor in causing 17-month-old Melody's death when she left her unsupervised at Grandmother's home after the incident with Carl Jr. These findings are not factually irreconcilable.[6]

Mother also argues that the court erred in applying section 300, subdivision (f) to her with respect to Carl Jr.'s petition because she was not Carl's custodial parent.[7] Here too, she is mistaken. A child comes within juvenile court jurisdiction under subdivision (f) if his or her parent "caused the death of another

---

[6] We choose not to treat this argument as forfeited for appeal by counsel's failure to raise it below, although any confusion about the court's factual findings could and should have been addressed before the juvenile court.

[7] Mother also makes this argument about Carl Jr.'s subdivision (b) allegations, but as the court found those allegations not proven we see no reason to address it.

child through abuse or neglect." There is no requirement that the parent whose neglect caused the child's death have physical custody of the surviving child. Accordingly, the substantial evidence that Mother's negligence was a substantial factor in Melody's death supports the court's finding of jurisdiction under subdivision (f) regardless of whether Mother was Carl Jr.'s custodial parent. "Once the child is found to be endangered in the manner described by one of the subdivisions of section 300 . . . the child comes within the court's jurisdiction, even if the child was not in the physical custody of one or both parents at the time the jurisdictional events occurred. [Citation.] For jurisdictional purposes, it is irrelevant which parent created those circumstances.' " (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1491–1492.)

Finally, Carl Jr. argues the court erred in finding untrue the jurisdictional allegation under subdivision (b)(1) that "the parents have failed to protect the minor adequately in that he has been residing in the home of a relative (the maternal grandmother) in which supplies of dangerous medications are left within easy access of children. The minor stated that 'all the children can get into' the medication. The minor had previously been hospitalized (in February of 2014) after ingesting the same relative's methadone pill. A sibling Melody F. also died in the home . . . and an autopsy documented that Melody had methadone in her system at the time of her death." Carl Jr. argues the court's dismissal of this allegation because he "seemed to be aware" of the risks of ingesting drugs left around the house does not support its conclusion that the conditions of Grandmother's home did not place him at substantial risk of harm.

We understand the Agency's disappointment that a juvenile court could reach such a conclusion about an eight-year-old boy under these circumstances. Nonetheless, we will not address this finding because the court asserted jurisdiction over Carl Jr. pursuant to subdivision (f). That jurisdiction is unaffected

24

by the court's ruling on the subdivision (b) allegations, whether or not it would withstand appellate review were the issue squarely before us.  " ' "[T]he minor is a dependent if the actions of either parent bring [him] within one of the statutory definitions of a dependent." ' [Citation.]  For this reason, an appellate court may decline to address the evidentiary support for any remaining jurisdictional findings once a single finding has been found to be supported by evidence."  (*In re I.A., supra,* 201 Cal.App.4th at p. 1492; *In re Alexis E.* (2009) 171 Cal.App.4th 438, 451*; In re Shelley J.* (1998) 68 Cal.App.4th 322, 330; *Randi R. v. Superior Court* (1998) 64 Cal.App.4th 67, 72.)

## II.  Disposition

### A.  Carl Jr.

After sustaining the subdivision (f) allegation regarding Mother's role in the death of Carl Jr.'s sibling, the court declared him to be a dependent of the court, then immediately dismissed his dependency petition with orders specifying that Carl Sr. was to retain physical custody.  Carl Jr. asserts the court erred in dismissing the petition because further findings were required by rule or statute, and the court could not return Carl Jr. to his father's care without ordering services required by law.  He also suggests the court erroneously believed the law *compelled* it to dismiss his petition because Carl Sr. was a "non-offending" custodial parent.  We agree the dismissal was error.

### 1.  Background

After the jurisdictional rulings, the parties and court turned to the appropriate disposition for Carl Jr.  While the thread of the discussions is difficult to untangle, it seems clear that in varying measures the participants shared confusion over the relevant law.  It was suggested, although without any clear resolution, that the untrue finding on the failure to protect allegations directed to Carl Sr. deprived the court of jurisdiction to do anything but return the boy to his

25

father's custody. After addressing visitation issues, the court indicated it was inclined to dismiss Carl Jr.'s dependency petition and place him with Carl Sr. This was explored during later colloquy:

"[Mother's Counsel]: "[M]y understanding of what happened, if it helps the Court, and this is not because it impacts me at all, is I understood that there was a no—[Carl Sr.] was a non-offending parent and, therefore, the Agency agreed that the case by law should be dismissed. [¶] [The Court]: And that's in its entirety? [¶] [Agency's Counsel]: And, your Honor, my understanding is, is that under— what we discussed yesterday was that under 361, I believe it is, is that the Agency's—there were no petition counts with regards to father. The Agency—by law since there is no petition counts as to father, father is a non-offending parent, I think that—the Agency continues to believe that there is still a risk to this child. [¶] [The Court]: Of course. No, no, I understood that you objected to my findings. [¶] . . . . [I]n this case mom is the center of it. Then configured around mom . . . [¶] is the two fathers, that there are (*sic*) domestic violence conflict or conflict between the two fathers, and within that is the children, which is why I'm making the decisions I'm making, because the law requires me to. But that's the—the difficulty of making decisions in regards to [Carl Sr.] was because of this configuration. I understand that. [¶] . . . [¶] But the law tells me that I am not supposed to look at the best families. I'm not supposed to look at what's—I'm supposed to look at what—if there's a violation in regards to the petition. So that's what I did. [¶] . . . [¶] So it's my understanding that that petition then is dismissed."

## 2. Analysis

First, we reject the argument raised by both the Agency and Carl Sr. that Carl Jr. forfeited his right to challenge the dismissal on appeal by acquiescing or failing to object to it at trial. "Where, as here, 'the facts are not disputed, the effect

26

or legal significance of those facts is a question of law,' which 'is not automatically subject to the doctrine of forfeiture.' " (*In re Rebecca S.* (2010) 181 Cal.App.4th 1310, 1314.) We decline to deem this important issue forfeited because it appears that all participants in the proceedings were unclear on the governing law, and an appellate determination on the validity of the dismissal could bear upon whether this child and family get the supervision, support and stability offered by our dependency system. (See *In re S.B.* (2004) 32 Cal.4th 1287, 1293–1294; *In re Rebecca S, supra* at pp. 1313–1314.)

"A section 300 dependency hearing is bifurcated to address two distinct issues. First, at the jurisdictional hearing, the court determines whether the child falls within any of the categories set forth in section 300. If so, the court may declare the minor a dependent child of the court. [Citation.] Then, at the dispositional hearing, the court must decide where the child will live while under its supervision, with the paramount concern being the child's best interest. [Citation.] The juvenile court has broad discretion to decide what means will best serve the child's interest and to fashion a dispositional order accordingly." (*In re Corey A.* (1991) 227 Cal.App.3d 339, 345–346.)

Once the juvenile court has found the minor comes within its jurisdiction under section 300, it may choose among a number of alternative courses of action in selecting an appropriate disposition. "In most cases at the disposition hearing the court determines what services the child and the family need to be reunited and free of court supervision. The court may enter an order ranging from dismissal of the petition (§ 390; rule 5.695(a)(1)) to declaring dependency, removing physical custody from the parents and making a general placement order for the child (§ 361; rule 5.695(a)(7)). If appropriate, the court may declare the child a dependent and, without removing the child from his or her home, order family maintenance services to ameliorate the conditions that made the child subject to the

27

court's jurisdiction. (§ 362, subd. (a); rule 5.695(a)(5).) Alternatively, if the court determines by clear and convincing evidence there is a substantial danger to the physical health, safety, protection or physical or emotional well-being of the child if the child remains in his or her home and there is no other reasonable means to protect the child (§ 361, subd. (c)(1)-(4); rule 5.695(d) [removal of custody—required findings]), in the absence of a noncustodial parent who desires custody (see § 361.2), the child must be removed from the physical custody of his or her parents and placed 'under the supervision of the [county] social worker who may place the child' " in an appropriate home. (§ 361.2, subd. (e); *Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 302–303.)

Here, the court's dismissal of the petition is problematic for a number of reasons. First, it does not comply with the statutory requirements for dismissal. Section 361.2, which the Agency suggests as a basis for the court's ruling, applies only when the court places the dependent child with a parent "with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300." (§ 361.2, subd. (a).) Carl Sr. was Carl Jr.'s custodial parent when Melody died, so section 361.2 is inapplicable on its face.

Pursuant to section 390, which Carl Sr. and the Agency assert as authority for the court's action here, the juvenile court may "dismiss the petition or may set aside the findings and dismiss the petition if the court finds that the interests of justice and the welfare of the minor require the dismissal, and that the parent or guardian of the minor is not in need of treatment or rehabilitation." But a petition may not be dismissed under section 390 unless the court makes the statutorily required findings, namely: (1) "that the interests of justice and the welfare of the minor require the dismissal' and (2) "that the parent or guardian of the minor is not in need of treatment or rehabilitation." (See *Los Angeles County Dept. of Children*

28

*and Family Services v. Superior Court* (2008) 162 Cal.App.4th 1408, 1418 (*Los Angeles CFS*) italics omitted; *In re Natasha H.* (1996) 46 Cal.App.4th 1151, 1156–1157 (Natasha H.); (Cal. Rules of Court, rule 5.695.) "Such dismissals are rare and usually occur only when the goal of protecting the child has been achieved without court intervention." (Abbott, et al., Cal. Juvenile Dependency Practice (2015) § 5.15, p. 318.)

Here, as in *Natasha H.*, the court did not make the required findings. Nor could it. Despite the availability of other housing options, Carl Sr. chose to place his young son at risk by living with Grandmother, even after Carl Jr. was poisoned by the methadone left freely around the house in reach of the children. He exposed his son to marijuana. He had a sexual relationship with Mother when she was a minor, impregnating her when she was 13 or 14 years old. He abused her in front of their son. He exhibited callous disregard for the lives and wellbeing of his son's young half-sisters when they were in Grandmother's home, feeling no responsibility to protect them from obvious hazards there. He lacked appropriate housing. None of that was seriously disputed. On this record, it is difficult to understand how a trier of fact could conclude Carl Jr.'s welfare and the interests of justice demanded that the court terminate its dependency jurisdiction. As Connie wrote, "[Carl Sr.] needs to demonstrate his ability to make decisions in the best interest of his son and that demonstration should [be] monitored over a significant period of time. Carl Jr. has parented himself long enough."

Nor, contrary to Carl. Sr.'s argument, does subdivision (a) of rule 5.695 authorize the dismissal of a petition without the findings required by section 390. The rule permits the court at disposition to "(1) [d]ismiss the petition with specific reasons stated in the minutes." The term "specific reasons" plainly refers to the findings required by section 390, which rule 5.695 implements. Any other interpretation would be inconsistent with the legislative intent expressed in the

29

statutory enactment, and therefore invalid. (See *Los Angeles CFS, supra,* 162 Cal.App.4th at p. 1420; *California Court Reporters Assn. v. Judicial Council of California* (1995) 39 Cal.App.4th 15, 23–26.)[8]

The Agency's suggestion that section 362, subdivision (c) authorizes the dismissal is equally unpersuasive. It provides: "If a child is adjudged a dependent child of the court, on the ground that the child is a person described by Section 300, and the court orders that a parent . . . shall retain custody of the child subject to the supervision of the social worker, the parents or guardians shall be required to participate in child welfare services or services provided by an appropriate agency designated by the court." This provision says nothing about the court's power to dismiss a dependency, and in any event seemingly would not apply where, as here, the court made no provision for Agency supervision.

Carl Sr.'s remaining arguments are also meritless. He claims the court did not find Carl Jr. to be a dependent of the court, but it clearly did. He contends there was no clear and convincing evidence to support removing Carl Jr. from his custody as required under section 361, subdivision (c),[9] but there is no challenge here to the court's placement of Carl Jr. in his custody. The question, rather, is whether the court erred when it dismissed the petition. Section 361, subdivision (c) has no bearing on that question.

_____

[8] While rule 5.695 specifies seven potential dispositions the court may order, four of these include a declaration of dependency while three, including the option of dismissal, do not. While we need not resolve the question, it bears asking whether rule 5.695 authorizes the court to dismiss a petition once, as here, it has declared the child a dependent of the court.

[9] Section 361, subdivision (c) states that "[a] dependent child shall not be taken from the physical custody of his or her parents or guardian or guardians with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence" of one of five situations (six, if the child is an Indian child) set out in subdivisions (c)(1)-(6).

Lacking an apparent statutory basis and unjustified by the factual circumstances, the dismissal of Carl Jr.'s adjudicated dependency must be reversed and the matter remanded to afford the court the opportunity to consider, in light of current circumstances, the array of dispositional options available for his support. (See, e.g., § 360, subd. (b) [informal supervision with participation in services]; § 362, subd (c) [adjudication of dependency with placement in home subject to supervision and services]; § 16506 [availability of family maintenance services]; Abbott, et al., Cal Juvenile Dependency Practice (2015) § 5.15 et seq., pp. 318.322; Seiser & Kumli, Seiser & Kumli on California Juvenile Courts Practice and Procedure § 2.123-2.124, pp. 2-372—2-379 (Matthew Bender 2016).)

### B. Denial of Reunification Services

Mother, Carl Jr. and Harmony assert the court abused its discretion when it bypassed reunification services for Mother.  Here, we must disagree.

"Section 361.5, subdivision (a) generally provides that in dependency cases parents shall be entitled to reunification services 'whenever a child is removed from a parent's . . . custody,' '[e]xcept as provided in subdivision (b).'  Section 361.5, subdivision (b) provides a detailed list of circumstances in which such services need not be provided, commonly known as 'bypass' provisions.  The bypass provisions constitute a legislative acknowledgement that ' "it may be fruitless to provide reunification services under certain circumstances." ' " (*D.T. v. Superior Court* (2015) 241 Cal.App.4th 1017, 1033.)  One such set of circumstances arises when the court finds by clear and convincing evidence that "the parent or guardian of the child has caused the death of another child through abuse or neglect." (§ 361.5, subd. (b)(4).)  Upon such a finding, the court "shall not order reunification" for that parent unless it finds by clear and convincing evidence that reunification is in the child's best interest.  (§ 361.5, subd. (c).)

31

Thus, when the court has sustained a jurisdictional allegation under section 300, subdivision (f) the parent must affirmatively show that reunification would be in the child's best interest.  (*Mardardo F. v. Superior Court* (2008) 164 Cal.App.4th 481, 492.)   "To determine whether reunification is in the child's best interest, the court considers the parent's current efforts, fitness, and history; the seriousness of the problem that led to the dependency; the strength of the parent-child and caretaker-child bonds; and the child's need for stability and continuity.  [Citation.]  A best interest finding requires a likelihood reunification services will succeed; in other words, 'some "reasonable basis to conclude" that reunification is possible.' "  (*In re Allison J.* (2010) 190 Cal.App.4th 1106, 1116;  *In re William B.* (2008) 163 Cal.App.4th 1220, 1228–1229.)

Mother and Harmony argue, in essence, that uncontradicted evidence compelled a finding it was in the children's best interests to provide Mother reunification services.  "When sufficiency of the evidence to support a finding is challenged on appeal, the appellate court determines if there is any substantial evidence to support its finding.  [Citation.]  Moreover, the court cannot reverse the juvenile court's determination, reflected in the dispositional order, of what would best serve the child's interest, absent an abuse of discretion."  (*Ethan N.*, *supra*, 122 Cal.App.4th at pp. 64–65.)  And when the party asserting a claim of insufficient evidence had the burden of proof at trial, "the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law.  [Citations.]  Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding."  (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528 (*I.W.*).)

The court's application of these principles in *I.W.* seems particularly relevant here. It wrote: "[A]s in many dependency cases, the case posed evidentiary conflicts. And, as is common in many dependency cases, this case obligated the juvenile court to make highly subjective evaluations about competing, not necessarily conflicting, evidence. . . . [T]he juvenile court considered the conflicting, competing evidence and essentially discounted mother's evidence in concluding that mother had failed to carry her burden of proof. It is not our function to retry the case. We therefore decline mother's implicit invitation to review the record so as to recount evidence that supports her position (reargument) with the object of reevaluating the conflicting, competing evidence and revisiting the juvenile court's failure-of-proof conclusion." (*In re I.W.*, *supra*, 180 Cal.App.4th at pp. 1517, 1528.) Here, in view of Connie's testimony that Mother could not reunify within the reunification period, "[t] his is simply not a case where undisputed facts lead to only one conclusion." (*Id*. at p. 1529.)

Harmony also asserts the court erroneously based its decision on a conjecture that her placement with maternal aunt Iona V., and, with it, Mother's access to frequent visitation, would become permanent. Not so. The court exhaustively reviewed the evidence to reach its determination that reunification was not in Harmony's best interest. While it mentioned its expectation that there would be visitation, nothing in the record suggests, as Harmony claims, that this expectation "form[ed] a significant basis for the court's decision to deny reunification services as purported mitigation of the detriment." To the contrary, the court concluded based on all the evidence that Mother could not, and would not within the reunification period be able to, provide Harmony with the parenting she needed. The record supports its determination, and we are not free to conclude otherwise.

Mother's assertion that the court should have provided her with services to help her reunify with Carl Jr. is also unavailing, although for a different reason. By express statutory requirement, "[f]amily reunification services shall only be provided when a child has been placed in out-of-home care, or is in the care of a previously noncustodial parent under the supervision of the juvenile court." (§ 16507, subd. (b))  Carl Jr. was neither placed in out-of-home care nor with a previously noncustodial parent.  Rather, he was returned to the custody of his father, his custodial parent.  Accordingly, there was no legal basis for the court to provide Mother with services designed to help her reunify with her son.

## DISPOSITION

The order dismissing Carl Jr.'s petition is reversed and the matter is remanded to the juvenile court for further proceedings.  In all other respects, we affirm.  Carl. Sr.'s motion to strike a portion of Carl Jr.'s reply brief is denied. Mother's request for judicial notice of post-disposition orders regarding visitation or, alternatively, to introduce those orders as postjudgment evidence, is denied without prejudice to mother's right to incorporate and address any such orders should she seek modification of the juvenile court's orders upon grounds of changed circumstances pursuant to section 388.  (See *In re Zeth S.* (2003) 31 Cal.4th 396, 413–414; *cf. In re N.S.* (2016) 245 Cal.App.4th 53.)

34

_____

                                 Siggins, J.

We concur:

_____

Pollak, Acting P.J.

_____

Jenkins, J.

*In re H.F. et al.*, A147335/A147220

35

Trial Court:                                   City & County of San Francisco Superior Court


Trial Judge:                                   Honorable Newton J. Lam


Linda J. Harvie, First District Appellate Project, for Defendant and Appellant, N.B.


Jacob I. Olson, First District Appellate Project, for Defendant and Appellant, K.F.


Donna Wickham Furth, First District Appellate Project, for Appellant, Carl Jr.


Seth Forrest Gorman, First District Appellate Project, for Appellant, Harmony F.


Jeremy Sugerman, Office of the City Attorney, for Plaintiff and Respondent, San Francisco Human Services Agency.


Leslie A. Barry, First District Appellate Project, for Respondent Carl Sr.