Filed 7/28/21  In re Mya B. CA1/4

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In re Mya B., a Person Coming Under the Juvenile Court Law. | |
| SAN FRANCISCO HUMAN SERVICES AGENCY,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>RAYMOND B.,<br><br>     Defendant and Appellant. | A161208<br><br>(San Francisco County Super. Ct. No. JD20-3135) |

Raymond B. (father) appeals from an order dismissing a juvenile dependency petition that was filed on behalf of his 12-year-old daughter Mya. The San Francisco Human Services Agency (Agency) filed the petition after father reported suspected child abuse by Mya's mother (mother).  After further investigation, the Agency moved to withdraw its petition and the case was dismissed.  On appeal, father contends the juvenile court lacked authority to dismiss Mya's petition.  We reject this contention and affirm.

1

# FACTUAL AND PROCEDURAL HISTORY

## I. Background

On April 30, 2020, the Agency received a referral about Mya from an unidentified party. At that time, Mya alternated weeks living with father in San Rafael and mother in San Francisco, and a week's stay with father was coming to an end. The reporting party stated that Mya became "emotional" while doing her homework and when she was asked how homework was done at mother's house, she broke down and disclosed that mother had been hitting her with a belt, hanger, and a giant pencil. Then the reporter put Mya on the phone so she could recount an incident that occurred the previous week.

Mya reported that she had spilled something that got all over mother's things and tried to apologize. But mother said that words don't matter and hit Mya with a belt on her arm, lower back, and butt, causing bruises. Mya said there was another incident when mother hit her on the butt with a belt because she took too long to clean up things on her bed. Mya stated that mother hit her with an object " 'all the time,' " but then she became "hesitant to answer any more questions" and the reporting party returned to the phone.

The reporting party stated that Mya spent a lot of time home alone and did not have help navigating online learning. Mya did not want to return to mother's home the following day and she was afraid about what would happen if mother found out that she had disclosed what was going on at mother's house. The reporting party stated that father had asked mother if Mya could stay longer at his house, but mother refused. The reporting party asked whether father had to return Mya to mother despite his concern for Mya's safety. The party was advised that father could seek an emergency protective order from the court or the police.

That same day, father took Mya to a police station in San Francisco and made a report of possible child abuse. Father reported that Mya told him that mother screamed at her, was easily upset by her, and hit her with a "giant size pencil . . . on her backside." Father said that Mya had a bruise on her arm that mother made with a belt, and another bruise on her leg that she was unsure how she got. An officer spoke with Mya, who confirmed father's story and said she was afraid to go to mother's home. The officer observed a bruise on Mya's arm but could not determine if it came from a belt. Father produced photos of the bruise. The police helped father secure a five-day restraining order protecting Mya from mother.

An Agency social worker interviewed Mya and mother on April 30. Mya reported that mother hit her with a belt and showed the social worker a bruise on her right arm and left leg. Mother admitted that she used an opened hand to discipline Mya when other forms of discipline did not work, but she denied hitting Mya with an object and said she never noticed leaving any marks on her daughter.

During the Agency's investigation, mother agreed that Mya could stay with father after the five-day restraining order expired while the Agency developed a safety plan that would allow Mya to return to mother's home. Meanwhile, mother enrolled in a "Positive Parenting" program, so she could learn different ways to discipline Mya.

The Agency's safety plan required that mother not use physical discipline on Mya. If mother became frustrated with Mya, she was to take a walk and/or talk with her parents (who also lived in the home) to strategize about proper ways to discipline that were not physical. The maternal grandparents agreed to support mother and check in with the Agency.

3

Father agreed to check in daily with Mya when she stayed with mother and to report any concerns to the Agency.

On May 10, 2020, which was Mother's Day, Mya had a positive visit with mother and reported feeling comfortable being with mother. Mya spent the week of May 15 to May 22 with mother and both reported having a good week. Mother reported that she used skills she had learned in her parenting program to communicate with Mya.

On May 22, 2020, father told the social worker that when he picked up Mya from mother's home, she had bruises on her back, arm and leg. He asked Mya where the bruises came from, but she was not sure. Father took pictures of the bruises and sent them to the social worker. On May 26, the social worker talked to Mya about her bruises and she reiterated that she did not know how she got them. Mya stated that mother did not hit her during the previous week. The social worker spoke with mother, who reported that she had noticed the bruises and Mya told her that she did not know how she got them. Mother indicated that Mya sometimes got marks from bumping into things. The social worker consulted a doctor, who opined that "the location of the marks [were] not specific for abuse, but that they [were] big to not remember where they came from."

On May 26, 2020, an Agency supervisor interviewed father and Mya. Father discussed how he noticed a bruise on May 22, and Mya had not been able to explain it. Father said that Mya had not mentioned the bruise again. When the supervisor met with Mya alone, she confirmed again that she did not remember how she got the recent bruise. The supervisor noticed another fresher looking bruise on Mya's arm. Mya suggested that she may have gotten that bruise while playing with friends or the dog while she was staying with father. Mya showed the supervisor another fresh bruise on the

4

inside of her lower leg that she got while staying with father.  When the supervisor showed these fresh bruises to father, he said that he had not noticed them.  Father asked Mya about the new bruises and she said that she had bumped into things while playing.

Due to the additional unexplained bruises that Mya sustained while staying at both parents' homes, the Agency decided to file a dependency petition on Mya's behalf.  (Welf. & Inst. Code, § 300; subsequent undesignated statutory references are to this code.)  The Agency did not contemplate removing Mya from either parent, but it wanted court oversight so that it could monitor mother's progress in learning to use nonphysical forms of discipline.

## II.  Dependency Proceedings

In a petition filed on May 29, 2020, the Agency alleged that Mya comes within the jurisdiction of the juvenile court under section 300, subdivisions (a) [serious risk of physical harm] and (b)(1) [failure to protect].  The petition alleges that Mya sustained bruises that were inflicted nonaccidentally by mother, mother has anger management issues, and mother has used physical discipline on Mya.  These allegations are based on Mya's April 30 police report that mother hit her with a belt causing bruising; Mya's April 30 interview when she showed the social worker bruises and said mother hit her with a belt; and the additional bruises that were observed on May 22 and May 26, which nobody could explain.

On June 22, 2020, the court held an initial hearing on the petition. Both parents entered general denials and father was declared a presumed father.  The matter was continued until August for a settlement conference regarding jurisdiction and disposition.  On August 6, 2020, the Agency filed a jurisdiction/disposition report recommending dismissal of the petition.  This

5

recommendation was made after a further assessment of the jurisdictional allegations by social worker Chris Chan, who prepared the Agency's report. Chan outlined three reasons for seeking to withdraw the dependency petition. First, Mya was diagnosed with leukemia in early June. Chan consulted with Mya's oncologist, who opined that the bruises Mya received in April and May could have been the result of her having cancer. Second, when Chan interviewed Mya, she reported that mother disciplined her by yelling or taking away privileges, but that mother did not use physical forms of discipline. Mya denied that she was hit by mother, with or without an object. Third, mother also denied physically disciplining Mya with a belt or any other object. She acknowledged spanking Mya when Mya was younger but denied hitting her with a belt or otherwise causing the bruises that Mya had in April and May.

Chan reported that he had virtual face-to-face contact with Mya who was in the hospital receiving treatment for her cancer and appeared to be in good spirits. Because of the COVID pandemic, Mya's parents were the only people who could visit and they took turns by her bedside. Mya's doctor reported that both parents were being appropriate, attentive and loving. The jurisdiction/disposition report concludes by stating that the Agency was "respectfully withdrawing the petition" because the safety concerns alleged in that petition had been "clarified and addressed." There was no remaining concern about interactions between Mya and mother, and the Agency never had any other concern about the parents' homes or their ability to provide for Mya.

The jurisdiction/disposition report does not contain updated information about father because father did not respond to any of Chan's inquiries. However, at the August 13, 2020 settlement conference, father

objected to the recommendation to dismiss Mya's case and the matter was continued for a contest.

## III. The Contested Hearing

The contested hearing was held on October 19, 2020. After the Agency reports were admitted into evidence, the juvenile court heard testimony from social work Pernita Brown and from father.

Brown, who was assigned to this case approximately two months before the contested hearing, personally interviewed mother, father, and Mya. Brown testified that after talking with Mya, she did not have any concerns regarding the child's safety. Mya was still in the hospital but things were going well. Based on what Mya reported to her, Brown felt there was no physical abuse that happened. There was "probably . . . some yelling," but that had stopped, although that change had "a lot" to do with the fact that Mya was hospitalized. Brown acknowledged that father had ongoing "concerns about what [was] going on in Mom's home" and wanted an open case so that mother could "learn different ways . . . to parent" Mya. But the Agency continued to recommend withdrawal of the petition.

Father's counsel cross-examined Brown about the Agency reports, questioning how the incidents that Mya described in late April were not physical abuse. Brown testified that the allegations were concerning, but they were not repeated by Mya when Brown interviewed her. Brown had asked Mya why she originally said that mother hit her and threw things at her, but Mya "just said that it didn't happen." Brown did not ask Mya "why she would make something like that up."

Father testified that he was concerned about Mya's safety in mother's home even before Mya disclosed to him that mother hit her with a belt. When father would ask Mya about how things went after a week with

7

mother, she would say "some good, some bad," and would tell him about "a lot of verbal abuse from Mom." Father recalled that Mya told him that mother verbally abused her when she did not get up on time or if she did not go to bed when she was supposed to, but Mya told him "very little" about this abuse "because she was so upset" and would "shut down," so he would just give her space.

Father testified that when Mya admitted to him that mother had hit her with a belt, she told him that the "verbal and physical abuse was going on for about four years." In father's mind, this timeline corresponds with the death of Mya's maternal great-grandmother. Father testified that mother and Mya used to stay together at the maternal great-grandmother's home, but after she died, they had to live in a home with mother's parents and other extended family. Father has concerns about that household because Mya feels that she is always in someone's way, and does not get the support she needs to navigate the challenges of online learning.

Father testified that when Mya disclosed to him that mother hit her with a belt, she described as many as three incidents when mother hit her or threw something at her. Father confronted mother about the incidents but she denied that they happened. Father also confronted the maternal grandparents about the "situation" and they both "denied the allegation." Father acknowledged that after Mya told people mother had abused her, she "later told the social worker, 'No. Mom doesn't hit me with a belt.'" Father did not ask Mya why she changed her story, but he opined that she recanted because she is afraid of getting cut out of mother's life. Father believes that mother has been keeping her anger toward Mya in check because Mya is sick. Once Mya's cancer is resolved, father believes that mother's angers will resurface and "affect Mya to the point where then she will also carry those

8

angers and might lose herself."

During closing arguments, father's counsel urged the court not to dismiss Mya's dependency petition, arguing that the jurisdictional allegations were proven by Mya's specific allegation of abuse by mother, father's testimony that mother manipulated Mya into withdrawing her allegation, and mother's refusal to acknowledge that she has a problem. Mya's counsel disagreed and supported the Agency's recommendation to dismiss the petition, offering three reasons: the evidence of abuse is inconclusive; mother cooperated with the Agency, took a parenting class and complied with the safety plan; and the circumstances of Mya's life have changed because of her cancer diagnosis and she does not need the additional stress of a dependency case. Mother's counsel also supported the Agency's recommendation, arguing that father's concerns do not warrant dependency court involvement.

The juvenile court judge asked several questions about the evidence before making a ruling. For example, he inquired about the timing of Mya's accusations, who she told, and which bruises she claimed were inflicted by mother. The court also asked Mya's counsel if she was aware of a reason that Mya might have made an accusation against mother that was not true. Counsel responded by suggesting that Mya was probably "angry at her mother." Ultimately, the court dismissed the dependency petition and left in place existing family law orders granting joint custody of Mya to her parents. The court expressed its hope that the parties would work together to help Mya get better. It also opined that Mya's parents could address many of their issues in their ongoing family law case. As to the specific issue of dependency jurisdiction, the court took "seriously" the Agency's determination that the case should not continue and adopted its recommendation to dismiss the petition.

## DISCUSSION

Father contends the order dismissing Mya's petition must be reversed because the juvenile court failed to comply with section 390, which states: "A judge of the juvenile court in which a petition was filed, at any time before the minor reaches the age of 21 years, may dismiss the petition or may set aside the findings and dismiss the petition if the court finds that the interests of justice and the welfare of the minor require the dismissal, and that the parent or guardian of the minor is not in need of treatment or rehabilitation." According to father, the juvenile court's failure to make the findings required by section 390 was prejudicial error because there is no substantial evidence to support them. We reject this claim of error on two independent grounds.

First, we are not persuaded that the juvenile court was required to make findings under section 390 before dismissing Mya's petition. The Agency report requesting dismissal of this case does not invoke section 390, but focuses instead on the lack of evidence to prove the jurisdictional allegations in Mya's petition. At the contested hearing, Agency counsel did argue that the interests of justice and the welfare of the minor require dismissal of the petition under section 390, but nothing in the juvenile court's oral ruling or minute order indicates that the court relied on that provision.

Under section 350, juvenile courts have the power to "control all proceedings during [dependency] hearings with a view to the expeditious and effective ascertainment of the jurisdictional facts and the ascertainment of all information relative to the present condition and future welfare of the person upon whose behalf the petition is brought." (§ 350, subd. (a)(1).) This power includes the authority to dismiss a dependency petition when the Agency has not carried its burden of proving jurisdictional allegations. Pursuant to section 350, subdivision (c) (section 350(c)), the juvenile court may dismiss a

10

dependency petition "when, upon weighing the evidence on behalf of the agency and the minor then before it, it finds that the burden of proof has not been met." (*In re Eric H.* (1997) 54 Cal.App.4th 955, 968–969; see also *In re Emily D.* (2015) 234 Cal.App.4th 438, 449.) In exercising this authority, the court is essentially a trier of fact, who weighs the evidence and considers the credibility of witnesses. (*In re Roberto C.* (2012) 209 Cal.App.4th 1241, 1253 (*Roberto C*).) On appeal, the decision is reviewed under the substantial evidence test. (*Id.* at p. 1254.) We "resolve conflicts in favor of the decision, and do not reweigh the evidence or determine the credibility of the witnesses. And '[a]bsent indisputable evidence of abuse—evidence no reasonable trier of fact could have rejected—we must . . . affirm the juvenile court's determination.' " (*Ibid.*)

Here, father challenges the juvenile court's decision not to exercise jurisdiction under section 300, subdivision (a).[1] Section 300, subdivision (a) provides: "A child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court: [¶] (a) The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian. For purposes of this subdivision, a court may find there is a substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the child or the child's siblings, or a combination of these and other actions by the parent or

---

[1] Because father does not challenge the court's decision not to exercise jurisdiction under section 300, subdivision (b)(1), we presume that ruling was correct. (See *In re J.F.* (2019) 39 Cal.App.5th 70, 79 ["The juvenile court's orders are 'presumed to be correct, and it is appellant's burden to affirmatively show error' "].)

guardian that indicate the child is at risk of serious physical harm. For purposes of this subdivision, 'serious physical harm' does not include reasonable and age-appropriate spanking to the buttocks if there is no evidence of serious physical injury."

The record before us contains substantial evidence that Mya did not suffer a serious injury nonaccidentally inflicted by mother and that she did not face a substantial risk of serious future injury at the time that the juvenile court made its ruling. Although Mya accused her mother of hitting her with a belt and other objects, she withdrew that accusation prior to the contested hearing and stated unequivocally that mother had not hit her. This evidence alone substantially supports a finding that section 300, subdivision (a) does not apply. Moreover, even before Mya recanted, she experienced bruising that she did not attribute to mother. Indeed, Mya was certain that mother did not cause the bruises that were discovered in May 2020, and it was those unexplained bruises which were the impetus for filing a dependency petition. Then, after the petition was filed, Mya received her diagnosis, which establishes a health-related explanation for all of Mya's bruises that has nothing to do with abuse. This evidence also substantially supports the decision to dismiss Mya's dependency petition.

Father argues that Mya's initial report to the police and to the Agency social worker in April 2020 constitutes substantial evidence that mother subjected Mya to serious physical harm by using physical objects such as a belt to discipline her. The question on appeal is not whether there is substantial evidence to support a finding the trial court did not make, but whether the court's actual finding is supported by the evidence. Because there is substantial evidence that section 300, subdivision (a) does not apply, and there is no " 'indisputable evidence of abuse,' " dismissal of the petition

12

was proper under section 350(c). (See *Roberto C.*, *supra*, 209 Cal.App.4th. at p. 1254.)

Father contends that even when a petition is dismissed at the jurisdictional stage of a dependency proceeding, the court must make findings under section 390. Pertinent authority proves otherwise. (See e.g. *In re Eric H.*, *supra*, 54 Cal.App.4th 955 [dismissal of dependency petition under section 350(c) pursuant to finding that allegations had not been proved by a preponderance of the evidence]; *Roberto C.*, *supra*, 209 Cal.App.4th 1241 [dismissal of dependency petition under section 350(c) pursuant to juvenile court's determination there was insufficient evidence to sustain the petition].) Father cites *In re E.A.* (2018) 24 Cal.App.5th 648 (*E.A.*), which mentions section 390 only in passing (*id.* at p. 665) and does not hold or intimate that compliance with section 390 is a perquisite to dismissal of a juvenile dependency petition. In the *E.A.* case, it was the minors rather than a parent who objected to an agency recommendation to dismiss dependency petitions. When a minor objects to an agency recommendation to dismiss a dependency petition, the court must determine whether dismissal is in the interests of justice and the welfare of the minor. (*Allen M. v. Superior Court* (1992) 6 Cal.App.4th 1069 (*Allen M.*).) The juvenile court in *E.A.* erred by failing to conduct a sufficient inquiry under *Allen M.* (*E.A.*, at p. 665.) No comparable issue is presented in this appeal because Mya's counsel fully supported the Agency's recommendation to dismiss the petition.

Even if we could be persuaded that section 390 does apply under the facts presented here, we would reject father's claim of error. "[A] petition may not be dismissed under section 390 unless the court makes the statutorily required findings, namely (1) 'that the interests of justice and the welfare of the minor require the dismissal' and (2) 'that the parent or

13

guardian of the minor is not in need of treatment or rehabilitation.' " (*In re Carl H.* (2017) 7 Cal.App.5th 1019, 1038.) On appeal, the court's findings are reviewed for substantial evidence. (*In re Marcus G.* (1999) 73 Cal.App.4th 1008, 1014.) But where, as here, a "statute does not mandate explicit findings, and where substantial evidence supports the juvenile court's order, findings may be implied." (*In re Aurora P.* (2015) 241 Cal.App.4th 1142, 1166; see generally *Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 58–60 [discussing the doctrine of implied findings].)

Substantial evidence supports the findings required for dismissal of Mya's petition under section 390. Dismissal serves the interests of justice and the welfare of Mya because there is substantial evidence that (1) Mya did not suffer serious harm and was not at risk of such harm in mother's care, (2) Mya's bruises resulted from a serious medical condition, (3) Mya wants and needs the full attention of both of her parents to aid her recovery, and (4) to the extent father and mother have issues regarding their coparenting obligations, those matters can be addressed in their family law case. There is also substantial evidence that neither of Mya's parents needs treatment or rehabilitation. The sole concern in this case was that mother may have used discipline techniques that put Mya at danger. Mother has consistently denied this allegation and yet she fully cooperated with the Agency, took a parenting class and complied with a safety plan. Under these circumstances, the juvenile court could have concluded reasonably that mother was not in need of rehabilitation or treatment.

Father contends that because the juvenile court must explicitly state its section 390 findings, either orally or in writing, the order dismissing Mya's petition must be reversed and the matter remanded for additional findings. Father bases this claim on rule 5.695(a)(1) of the California Rules

14

of Court, which states: "At the disposition hearing, the court may: [¶] (1) Dismiss the petition with specific reasons stated in the minutes." In the present case, Mya's petition was dismissed at a time when jurisdictional allegations had been made but not proven, and when the Agency itself had concluded that the allegations could not be proven. Because Mya's petition was not dismissed at a disposition hearing, rule 5.695 does not apply. (Compare *In re Carl H.*, *supra*, 7 Cal.App.5th at p. 1038 [dismissal of dependency petition at disposition hearing was not authorized by section 390 because court did not and could not have made the required findings].) Finally, Father contends that the evidence compels findings that dismissal of Mya's dependency case threatens her welfare and that mother needs reunification services. Father bases this claim on disputed allegations, including allegations that Mya withdrew, and ignores undisputed evidence supporting the trial court's implicit finding that Mya does not come within the juvenile court's dependency jurisdiction.

## DISPOSITION

The order dismissing Mya's petition is affirmed.


TUCHER, J.


WE CONCUR:

POLLAK, P. J.
BROWN, J.


*In re Mya B.* (A161208)

15