Filed 10/27/21  In re Emelina H. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re EMELINA H., A Person Coming Under the Juvenile Court Law. | B309019 (Los Angeles County Super. Ct. No. 19CCJP08202) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. LEAH A., Defendant and Appellant. | |

APPEAL from order of the Superior Court of Los Angeles County, Debra R. Archuleta, Judge.  Reversed.

Liana Serobian, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Sally Son, Deputy County Counsel, for Plaintiff and Respondent.

———————————————

Leah A. (Mother) appeals from the juvenile court's disposition order declaring eight-year-old Emelina H. a dependent of the court and terminating jurisdiction with a child custody order granting Mother and Fidel H. (Father) joint legal and physical custody, with Father having primary physical custody of Emelina in Texas.  Mother contends the disposition order constituted a de facto removal of Emelina from Mother that was unsupported by findings mandated under Welfare and Institutions Code, section 361, subdivision (c).[1]

We conclude the juvenile court abused its discretion in terminating jurisdiction at the disposition hearing without making findings that services and supervision were no longer necessary, finding instead that Mother appeared to have a continuing problem with alcohol abuse and it was not in Emelina's best interest to live with Mother.  We remand for the court to conduct a new disposition hearing based on current circumstances.

---

[1]     Further statutory references are to the Welfare and Institutions Code.

# FACTUAL AND PROCEDURAL BACKGROUND

A.      *The Referral and Investigation*

In November 2019 Mother and Emelina were living in the home of maternal grandmother Elaine C. in Monterey Park. Mother and Father separated when Emelina was three years old, and Father resided in Texas, where he worked in construction. Father visited Emelina three to four times per year, for about two weeks each visit.

On November 6, 2019 the Los Angeles County Department of Children and Family Services (Department) received a referral alleging the prior night Mother came home from a night of drinking and got into an argument with Elaine. Mother threw several household items at Elaine, including a flower pot that caused a one-inch "knot" on Elaine's head. Emelina was present nearby but did not sustain any injuries.

A social worker made an unannounced visit to Elaine's home the day of the referral. Elaine told the social worker the altercation occurred when Mother came home intoxicated and tried to take Emelina out of the home. Mother yelled at Elaine, became aggressive, and started throwing things, including a vase that hit Elaine in the head and knocked over a lamp. Emelina was sitting next to Elaine on the couch while Mother was throwing things. Elaine stated Mother did not have a history of getting drunk and had never been aggressive before. Mother was very loving and attentive toward Emelina. Elaine admitted she had been an alcoholic herself, but now she drank only occasionally.

Mother admitted to the social worker that she had thrown items at Elaine during the November 5 argument, but she did not

3

know Elaine had been injured. Mother said she did not drink often and only had one mixed drink the night of the argument. Mother said she had a very good relationship with Emelina, they would talk about everything, and they did not have difficult times. Mother agreed to take a drug test, but she declined to submit to a drug test on November 7 and 8, claiming she could not take the tests because of work.

The social worker interviewed Emelina separately. Emelina said Mother "acts crazy when she gets drunk," which occurred with "'a little'" frequency. Elaine also drank on occasion and "goes a little 'too off with beers.'" In the November 5 incident, Mother was throwing things, and Elaine suffered a "'big giant bump on her head.'" But Emelina was not hurt. Mother hit Elaine on other occasions, but there was no blood or any injuries. Emelina had seen Mother smoke something like a "'brown circle'" (described as being "like a circle but fatter") when Mother was bored. Emelina felt safe with Mother and Elaine. Emelina's teacher stated Emelina was a below-average student, but Emelina did not have behavioral problems.

On December 18 the social worker interviewed Father, who had been visiting since before Thanksgiving. Father suspected Mother had a potential alcohol problem based on what he had heard about a 2018 referral,[2] but during his prior visits he did not

---

[2] On November 25, 2018 the Department received a referral alleging mother had been drinking alcohol and fell on two steps, and while accompanied by Emelina to the hospital, Mother was belligerent toward police, paramedics, and hospital staff. However, after further investigation the Department deemed the referral inconclusive.

observe Mother drinking too much or exhibiting any troubling behaviors. When asked whether Mother had a history of aggressive behavior, Father responded she only became aggressive when she drank. He could not recall when Mother was last aggressive, and he denied Emelina was present. Father felt Emelina was not in any danger living in the home. Father drank beer occasionally and would smoke marijuana once or twice a week on vacation, but not at other times. Father had no other children and was willing to care for Emelina.

The social worker interviewed Emelina again, who noted Father was currently staying in Elaine's home with the family. Emelina liked having Father there because he was always nice to her and helped her with her homework. Emelina previously visited Father in Texas and got to see her cousins. Mother and Father got along, and Father "'never lets mom drink.'" Emelina did not like when Mother drank because when she did, the family would have a lot of arguments in the home. Emelina would get scared, although nothing would happen to her.

On December 18, 2019 Mother and Father tested positive for marijuana. Mother acknowledged she had smoked marijuana a few days before the test. The social worker also reported that in July 2019 Mother was cited for driving under the influence after refusing a sobriety test.

B.    *The Petition*

On December 24, 2019 the Department filed a petition on behalf of Emelina under section 300, subdivisions (a) and (b). The petition alleged Mother had a history of violent altercations with Elaine in the presence of Emelina, placing Emelina at risk of serious harm, and Mother was a current abuser of alcohol and

5

marijuana. The petition also alleged Mother created a detrimental home environment by allowing Elaine, a current abuser of alcohol, unlimited access to Emelina; Father knew of the endangering home environment and failed to protect Emelina; Father had a history of substance abuse and was a current abuser of marijuana; and Mother failed to protect Emelina from Father's substance abuse.

At the December 26 detention hearing, the juvenile court ordered Emelina released to the home of parents, with Emelina to live with Mother. The court ordered Mother to submit to weekly random and/or on-demand alcohol and drug testing and for Mother to attend a substance abuse program and counseling.

C.   *The Jurisdiction and Disposition Report*

The February 18, 2020 jurisdiction and disposition report stated Mother and Emelina had moved out of Elaine's home in January due to ongoing disagreements, and they were living with a friend in a studio apartment in Monterey Park. Mother told the dependency investigator she and Father did not have a family court order governing custody of Emelina, but in practice Mother was Emelina's primary caregiver and Father paid child support. Mother's relationship with Father was civil; she had no complaints about his parenting; and he was free to see Emelina any time he wished. Father was staying with paternal grandmother Celestina in Colton, and he would sometimes care for Emelina if Mother had to work late. In a February 13 interview with the dependency investigator, Mother denied being intoxicated and having an altercation with Elaine on the night of the referral incident. Mother further denied she was ever drunk

6

and that Elaine drank to excess.  Mother admitted to using marijuana, but never in Emelina's presence.

Father told the dependency investigator he lived with the paternal great-uncle, great-aunt, and first cousins in Texas and stayed with Celestina when he visited California.[3]  Father reported he previously believed Emelina was safe with Mother and Elaine, but recently Mother had been ignoring his calls and making it hard for him to speak with Emelina.  Father was upset to learn Emelina was doing poorly in school; he believed Mother did not spend sufficient time helping Emelina with her homework; and Mother was not interested in participating in a parent-teacher conference.  Father attended the parent-teacher conference without Mother.  Father admitted he had used marijuana in the past but stated he never used it around Emelina and now had stopped completely.

The Department recommended the petition be sustained as to Mother and Emelina be placed in the home of parents with family maintenance services.  The Department concluded Emelina's needs were being met and Father was now actively involved in her care, although Mother had already missed a family preservation services meeting due to a work conflict.  Since the detention hearing, Mother tested positive for marijuana

[3]     The March 10, 2020 last minute information for the court stated the dependency investigator spoke with the paternal great-aunt in Montgomery, Texas.  She reported the family owned a five-bedroom house on five acres with horses, livestock, and pets, and Emelina was welcome to live there with Father.  If Emelina were to move to Texas, she would attend Magnolia Elementary School, and a school bus would pick her up near the house.

at low levels two times, tested negative two times, and missed one test. Father's marijuana use did not appear to have impacted Emelina's care, and the Department recommended Father be declared nonoffending.

D.  *The Jurisdiction Hearing*

At the March 10, 2020 jurisdiction hearing,[4] Mother pleaded no contest to the allegations of the petition under section 300, subdivision (b), concerning Mother's altercation with Elaine and Mother's alcohol abuse, and the juvenile court sustained the allegations.[5] The court dismissed the remaining counts and amended the sustained count alleging Mother's substance abuse to remove the allegation Father failed to protect Emelina. Emelina was ordered released to the home of parents subject to existing orders and a stipulated parenting plan under which Emelina would live primarily with Mother through the end of the school year, with Father having visitation during the summer and holidays. The court set a disposition hearing for April 14, 2020, but the hearing was continued multiple times due to the COVID-19 pandemic and was later set for November 16, 2020.

---

[4]  Judge Kim Nguyen presided over the jurisdiction hearing; Judge Debra R. Archuleta presided over the subsequent disposition hearing.

[5]  The petition was amended to remove the allegations that Mother threw a flower pot at Elaine and that Mother and Elaine had pushed each other on previous occasions.

8

E.    *The Status Review Report and Last Minute Information for the Court*

The June 30, 2020 status review report stated Emelina was spending most of her time with Father, who had remained in California, although Emelina also stayed with Mother at the apartment of Mother's friend.  Father reported Emelina's education was his priority, and he assisted Emelina with her school work during the pandemic school closure.  Father stated, "'Emelina is getting used to my parenting [techniques] now . . . she thought I was too strict, but I have more structure than her mom.  I give her a schedule, and she loves being with her cousins.'"  Father expressed concern that if Emelina did not return to the classroom in the new school year, Mother would not follow through with proper home-schooling, and Father was unsure if Mother had an Internet connection at home.  Father stated the paternal great-uncle in Texas had agreed Father could stay in California for the time being because the family construction business had slowed during the pandemic.

The report concluded Emelina was doing well and enjoying her summer break with relatives on both sides of her family.  Mother had enrolled in a substance abuse outpatient program at Clinica Romero on February 18, 2020 and had submitted to seven random drug tests, all of which were negative.  However, Mother had missed three tests for drugs and alcohol with Pacific Toxicology since March 10, 2020.  She tested negative on 10 other occasions.

The November 5, 2020 last minute information for the court reported Mother had recently moved into a rented two-bedroom house in El Monte and found a steady job in the housekeeping industry.  Emelina continued to spend days to

9

weeks at a time in Father's care at Celestina's home, and Father assisted Emelina with schoolwork at Mother's home while Mother was working. The paternal great-uncle's construction business was beginning to pick up, and Father expected to return to Texas. He wanted Emelina to live with him in Texas during the school year. Paternal great-aunt was willing to assist with Emelina's care and schooling if Emelina moved to Texas with Father.

Between December 16, 2019 and October 29, 2020 Mother submitted to 22 tests with Pacific Toxicology that were negative for alcohol and drugs. However, six of Mother's tests were positive for marijuana (five of which occurred early in the testing period and showed low levels of marijuana), and Mother missed 19 tests. On July 16, 2020 Mother had a positive test for alcohol in the middle of the day, which, according to the social worker, suggested Mother was continuing to use alcohol. The report noted that in August 2020, Mother missed three of four tests; in September, she missed two of four tests; and in October, she missed all of her tests.

The case manager at Clinica Romero stated Mother had also been randomly tested 26 times by Clinica Romero and tested negative for drug use; however, none of Clinica Romero's tests measured the presence of alcohol. Mother showed progress in her family preservation program, and she showed improved confidence and attitude with her new job and home, and Father's assistance in caring for Emelina.

The Department found Emelina was stable, and although the COVID-19 pandemic had caused disruption in her schooling, Father's involvement had helped Emelina improve her reading skills and grade-level expectations. Further, Emelina's basic

10

needs were being met, there was no family conflict, and the parents engaged in positive coparenting. Although Mother was encouraged to continue working with Clinica Romero through her February 2021 completion date, the social worker concluded "[i]t does not appear that further supervision by [the Department] is necessary." The Department recommended the juvenile court "terminate jurisdiction with a Family Law Order granting shared legal and physical custody of Emelina [] to both parents . . . . It is further recommended when father Fidel moves back to Texas, that his residence be deemed the child's primary residence when school is in session, and that mother Leah shall have Emelina with her during Christmas break, spring break and summer break."

F.      *The Disposition Hearing*

At the disposition hearing held on November 16 and 17, 2020, the Department reiterated its recommendation that the court terminate jurisdiction because Emelina did not face an immediate risk of harm in either parent's care, with joint custody to Mother and Father and Father having primary physical custody of Emelina in Texas. Father's counsel joined the Department's recommendation and added that Father believed the school in his Texas neighborhood was superior to Emelina's current school.

Emelina's counsel joined the recommendation that the court terminate jurisdiction and order joint custody, but she stated Emelina preferred to live with Mother during the school year and spend breaks with Father. Mother's counsel agreed, arguing it would be in Emelina's best interest to remain in

California where she had lived her entire life and to finish the school year where she was enrolled.

The juvenile court expressed a concern that mother's drug tests at Clinica Romero did not include testing for alcohol, given that Mother primarily struggled with alcohol abuse. The Department responded that Mother was undergoing testing for alcohol use at Pacific Toxicology, and none of Mother's service providers reported an odor of any substances on Mother or observed her to be under the influence. The court responded, "I don't know why you're telling the court [Mother] appears to be in compliance and there are no concerns, because I'm reading the report right here." The court continued, "I am reviewing the [last minute information for the court], looking at three of four tests missed in August, two of four in September and all of October was missed." The court asked Mother's counsel why Mother had missed all of her testing obligations in October when she knew there was an upcoming hearing that would address custody. Mother's counsel responded that Mother had been testing through her program at Clinica Romero and "I don't know if she was aware they were [not] testing for alcohol." Further, Mother recently moved to a new house, obtained an new job, and "she's obviously caring for her daughter." Mother's counsel added that Mother was present by videoconference and would be happy to answer any questions from the court. The court did not ask Mother any questions.

The juvenile court found by clear and convincing evidence that Emelina had to be removed from Mother because there was a substantial risk of danger in the home of Mother as the primary caregiver, and there were no reasonable means by which Emelina could be protected without removal. The court expressed concern

that Mother had a positive alcohol test in the middle of the day in July of 2020, and "[t]here ha[ve] been too many no shows, too many failed tests, and no alcohol testing which had previously been ordered as part of this management and the case plan. . . ." The court indicated it intended to grant Mother and Father joint legal custody of Emelina with Father having primary physical custody and Mother having visitation during summer and holiday breaks. The court stated it would terminate jurisdiction upon receipt of a juvenile custody order. The court then continued the matter to the following day.

At the outset of the hearing on November 17, the juvenile court stated it had discussed with counsel "the fact that this court erroneously made removal orders from the Mother and giving home-of-parent custody to father," and the court vacated its orders from the previous day. The court found, "The court does not find by clear and convincing evidence that the child Emelina [] must be removed from the custody of Mother and awarded to Father," and instead "order[s] that she live, as indicated in the terms and conditions of the juvenile custody order that's going to be prepared in this matter. . . . Mother and Father to have joint legal custody with primary physical custody to Father[,] and Mother will receive the child for summer breaks and the holidays." The court explained, "The reason for the court awarding the visitation and the custody the way it did was the court was really very discouraged with the most recent testing that has not taken place with Mother. There was inappropriate testing, as far as this court was concerned. There seemed to be maybe even evidence of evading. . . . And with all of the numerous recent missed tests, this court found it was in the best interest of the child to award the primary physical custody to the

13

Father." The court ordered that jurisdiction terminate upon receipt of the juvenile custody order.

Mother timely appealed the juvenile court's November 16 and 17 orders.[6]

## DISCUSSION

Mother contends the juvenile court erred in terminating jurisdiction at the disposition hearing and issuing a custody order granting primary physical custody of Emelina to Father because the court failed to make the required findings under section 361, subdivision (c), to support removal of Emelina from her custodial parent. We agree the juvenile court abused its discretion in terminating jurisdiction, but for a related reason—the court failed to make the required findings that court supervision and services were no longer necessary, finding to the contrary that Mother appeared to have a continuing alcohol abuse problem as evidenced by her positive drug test and multiple missed tests.[7]

---

[6] The order terminating jurisdiction was entered on November 19, 2020, at which time the juvenile court entered a juvenile custody order. We take judicial notice of the November 19, 2020 order. (Evid. Code, §§ 452, subd. (c), 459, subd. (a).) We treat the notice of appeal as filed immediately after entry of the November 19 order. (Cal. Rules of Court, rule 8.104(d)(1); see *Valdez v. Seidner-Miller, Inc.* (2019) 33 Cal.App.5th 600, 607.)

[7] Had the juvenile court made the necessary findings under section 361, subdivision (c), to remove Emelina from Mother—which the court expressly did not do—it could then have placed Emelina in Father's primary custody and terminated jurisdiction. (See § 362.1, subd. (b)(1) [where the court removes a child from one parent and places the child with the other parent, the court

14

"If the juvenile court finds a basis to assume jurisdiction, the court is then required to hear evidence on the question of the proper disposition for the child." (*In re Destiny D.* (2017) 15 Cal.App.5th 197, 205 (*Destiny D.*); accord, *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 248; see § 358, subd. (a) ["After finding that a child is a person described in Section 300, the court shall hear evidence on the question of the proper disposition to be made of the child."].) "Typically, once the child has been adjudged to be a dependent child . . ., the juvenile court determines what services the child and family need to be reunited and free from court supervision." (*Destiny D.*, at p. 205; accord, *In re Anthony Q.* (2016) 5 Cal.App.5th 336, 345-346; see *In re Carl H.* (2017) 7 Cal.App.5th 1019, 1037 ["[A]t the dispositional hearing, the court must decide where the child will live while under its supervision, with the paramount concern being the child's best interest."].) "The court then sets a review hearing, which must be held within six months, to evaluate the family's circumstances and decide whether continued dependency jurisdiction is necessary. (§§ 366.21, subd. (e) [review hearing if child removed from physical custody of his or her parent], 364 [review hearing if child remains in the custody of one or both parents].)" (*Destiny D.,* at p. 206.)

"[T]he juvenile court retains the discretion in an appropriate case to terminate its jurisdiction at the close of a disposition hearing when it finds services and continued court

may "order that the [other] parent become legal and physical custodian of the child. The court may also provide reasonable visitation by the noncustodial parent. The court shall then terminate its jurisdiction over the child."].)

15

supervision are not necessary to protect the child." (*Destiny D., supra*, 15 Cal.App.5th at p. 208.) However, as we explained in *Destiny D.*, "it will be an unusual case when protections imposed at disposition will be sufficient to permit the conclusion that termination is appropriate." (*Id.* at p. 211.) We review a juvenile court's order terminating jurisdiction at the disposition hearing for an abuse of discretion. (*Ibid.*; accord, *In re D.B.* (2020) 48 Cal.App.5th 613, 625.)

As discussed, the juvenile court expressed its concern at the disposition hearing about Mother's positive test for alcohol in the middle of the day on July 16, 2020, and that "there was inappropriate testing" and "even evidence of evading." As the court observed, Mother missed three of four tests in August, two of four tests in September, and four of four tests in October. The court considered Mother's positive test and "numerous recent missed tests" in concluding "it was in the best interest of the child to award the primary physical custody to the Father." But that was not the correct standard for terminating jurisdiction. If anything, the court's findings showed Mother and Emelina would benefit from further court supervision and services to ensure that any drinking problem Mother continued to have (after attending a substance abuse program for seven months) was addressed so Emelina could be safe in Mother's care.

Given evidence of what appeared to be Mother's continuing alcohol problem, the dependency statute envisioned Mother receiving additional services at the disposition hearing, then the court holding a section 364 review hearing at which the Department would have the burden of establishing "by a preponderance of evidence that the conditions still exist which would justify initial assumption of jurisdiction under Section 300,

16

or that those conditions are likely to exist if supervision is withdrawn." (§ 364, subd. (c).) And notably, at the review hearing, a "[f]ailure of the parent . . . to participate regularly in any court ordered treatment program shall constitute prima facie evidence that the conditions which justified initial assumption of jurisdiction still exist and that continued supervision is necessary." (*Ibid*.) The juvenile court bypassed this procedure designed to protect the child.

The Department relies on our opinion in *Destiny D., supra*, 15 Cal.App.5th 197 to support the juvenile court's termination of jurisdiction in this case. The facts of *Destiny D.* are distinguishable. There, the mother of 15-year-old Destiny obtained a domestic violence restraining order and a temporary child custody order requiring the father to move out of the family home and giving mother sole physical custody of Destiny. (*Id*. at p. 201.) The juvenile court subsequently assumed jurisdiction over Destiny and sustained allegations the father abused alcohol and drove while intoxicated with Destiny in the vehicle, and the mother failed to protect Destiny from father's domestic violence and alcohol abuse. (*Id*. at p. 204.) The court terminated jurisdiction at the disposition hearing and entered a juvenile custody order awarding primary physical custody of Destiny to the mother with monitored visitation for the father. (*Id*. at pp. 204-205.) We rejected the father's contention the juvenile court did not have authority to terminate jurisdiction at the disposition hearing with entry of a custody order, explaining, "If no substantial risk of harm exists once those restrictions are in place, and ongoing supervision is unnecessary, termination of jurisdiction is appropriate." (*Id*. at p. 208.) We concluded that because the parents were in compliance with the domestic

17

violence restraining order, and the father was limited to monitored visitation, any risk to Destiny was eliminated.  (*Id*. at p. 212; see *In re D.B., supra*, 48 Cal.App.5th at p. 625 [disposition order terminating jurisdiction and awarding legal and physical of daughter to her nonoffending mother, with monitored visitation and psychological counseling for emotionally abusive father, was not an abuse of discretion where "[n]o evidence suggested [m]other or [f]ather would stop complying with the court's orders if the court closed the case[,]" and "all the evidence was [d]aughter would be safe without the court watching her."].)  Here, in contrast to *Destiny D.* and *In re D.B.*, the custody order limiting Mother to visitation during summer and holiday breaks would not ensure the safety of Emelina because Mother maintained joint physical custody with unrestricted visitation during Emelina's breaks.  The same findings that caused the juvenile court to place Emelina with Father (Mother's daytime positive test and multiple missed tests) show the conditions that led to the filing of the petition (Mother's excessive drinking) may still exist, and Mother may need more services.  While it may well be that Mother can address the court's concerns by testing negative and not missing any tests before a future review hearing, terminating jurisdiction without finding that additional services and court supervision were no longer necessary was an abuse of discretion.

## DISPOSITION

The juvenile court's disposition order terminating jurisdiction and entering a juvenile custody order is reversed, and the matter is remanded for the court to conduct a new disposition hearing based on current circumstances.


                                    FEUER, J.

We concur:


        PERLUSS, P. J.


        SEGAL, J.